# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-2155V

| | |
|---|---|
| ARIANA MARTINEZ,<br><br>           Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>           Respondent. | Chief Special Master Corcoran<br><br>Filed: July 28, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Benjamin Rex Eisenberg, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT[1]

On December 20, 2023, Ariana Martinez filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table claim – that she suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving influenza ("flu") and tetanus-diphtheria-acellular pertussis ("Tdap") vaccines on January 23, 2023. *Id.* The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

A disputed fact issue has arisen regarding whether Petitioner's injury meets the Act's severity requirement. For the reasons discussed below, I find it more likely than not that Petitioner can establish this claim element.

### I.   Procedural History

The parties made a tentative effort to informally resolve this claim but were ultimately unsuccessful. ECF Nos. 17-18. Respondent thereafter filed a Rule 4(c) Report in October 2024 (ECF No. 19), contending that Petitioner has not established that she suffered her alleged SIRVA for more than six months post-vaccination.[3] *Id.* at 8-10. Respondent also argues that Petitioner's alleged shoulder pain following her June 2024 car accident cannot be attributed to her 2023 vaccinations. *Id.* (citing Ex. 6 at 183). Petitioner has since filed no additional evidence. The issue of severity is thus ripe for consideration.

### II.  Relevant Authority

Petitioners carry the burden of establishing the matters required in the petition by a preponderance of the evidence. Section 13(a)(1)(A). One such requirement is "documentation demonstrating that [the petitioner][4] . . . suffered the residual effects or complications of such [vaccine-related] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i); *see also Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

The Act prohibits finding a petition requirement "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records

---

[3] Respondent also contests Petitioner's ability to establish other elements of a Table SIRVA claim, arguing that her pain was not limited to the shoulder in which the subject vaccines were administered, she did not exhibit limited range of motion, and the onset of her symptoms did not occur within 48 hours of the subject vaccinations. ECF No. 19 at 10-12 (internal citations omitted).

[4] Or other vaccinee, e.g., a minor or other person who is unable to represent his or her own interests, on behalf of whom the claim is brought.

contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs*., 997 F.3d 1378, 1383 (Fed. Cir. 2021). This is because medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.* Patients may not report every ailment they are experiencing. *Id.*

Indeed, medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs*., 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The Vaccine Rules afford the special master discretion in choosing whether to hold a hearing, stating that he or she "may decide a case on the basis of written filings without an evidentiary hearing." *See* Vaccine Rule 8(d); *see also Kreizenbeck v. Sec'y of Health & Hum. Servs.,* 945 F.3d 1362 (Fed. Cir. 2020) (holding that the special master did not abuse his discretion by resolving the claim on the written record without the petitioners' consent).

### III. Findings of Fact Regarding Severity

I make these findings after a complete review of the record to include all medical records, declarations, and additional evidence filed, and in particular the following:[5]

- Petitioner received the vaccines alleged as causal in her left deltoid on January 23, 2023, while at a visit with her primary care provider ("PCP"). Ex. 2 at 774.

- On February 1, 2023 (nine days post vaccination), Petitioner messaged her PCP stating "[w]hen [she] had gotten the vaccines [she] got the normal soreness for a few days. It had started going away but since Monday the pain is back on [her] left arm." Ex. 2 at 795. She also noted that "it feels like there is a lump on [her] top left area near [her] shoulder" and "the pain feels from there down." *Id.* Petitioner wrote that she did not have "much range of motion [("ROM")]" because of the pain. *Id.*

- Approximately one week later, on February 7, 2023, Petitioner messaged her PCP reporting that her pain was "not worse but the same." Ex. 2 at 794. She had a phone call with her PCP that day and reported she "received vaccines on 1/23/2023, x2 weeks – left arm at injection = small hard lump[.]" *Id.* at 801. The PCP assessed Petitioner with left shoulder joint pain and recommended rest, cold compresses, and to return to "normal activities slowly as tolerated." *Id.* at 804.

- During an in-person visit with another treater at her PCP's office on February 10, 2023, Petitioner reported "left arm pain after receiving vaccines on 1/223/23 [sic]." Ex. 2 at 822. Petitioner noted she had been taking NSAIDs "with minimal relief." *Id.* A physical examination revealed "full [ROM] with pain/discomfort." *Id.* Petitioner was assessed with left lateral epicondylitis, and she received information relation to "tennis elbow." *Id.* at 822-25.

- On February 15, 2023, Petitioner had an initial physical therapy ("PT") evaluation. Ex. 2 at 838. She reported "left elbow pain since receiving vaccinations on 1/23/2023." *Id.* She also "note[d] her pain extends from her left arm down to the forearm and hand[;] . . . she is noticing symptoms of electric-like, shooting pain, with some numbness over the left forearm." *Id.*

---

[5] While I have reviewed all the evidence filed to-date in this case, only evidence related to severity will be discussed herein, though other facts may be provided as necessary.

4

- During Petitioner's second PT visit on March 6, 2023, Petitioner reported ongoing "left arm and elbow pain." Ex. 2 at 847. The treater thought Petitioner's "symptoms [were] possibly consistent [with] left epicondylitis versus pain in left arm following receiving vaccines." *Id.* at 848. The treater recommended Petitioner reach out to her PCP for "further alternative treatment." *Id.* This was Petitioner's last PT session.

- On March 8, 2023, Petitioner spoke with her PCP and reported that she still had pain "in [her] upper shoulder where [she] was injected." Ex. 2 at 854. She wrote that she was "not sure why the notes keep saying it's pain in the elbow." *Id.* Petitioner expressed that she had not "found relief from the exercises," topical treatments (including lidocaine patches), and/or over-the-counter and prescription medications. *Id.* The PCP recommended steroids or local steroid injections to treat Petitioner's "SIRVA." *See id.* at 853-54; *see also id.* at 857. Petitioner opted for oral steroids. *See,* e.g., *id.* at 863, 866.

- Petitioner messaged her PCP on April 25, 2023, reporting that "[t]here hasn't been much change to the pain in the upper shoulder" after taking steroids for "some time." Ex. 2 at 866. She stated that she did "think it hurt[] a bit less but [she] also th[ought she had] just gotten used to it as the new norm." *Id.* The PCP recommended a steroid injection and to seek care with an orthopedist. *Id.* at 865.

- Three months and 25 days post vaccination, on May 18, 2023, Petitioner saw an orthopedist for "shoulder pain [that] began after having vaccine [sic] administered." Ex. 2 at 867. Petitioner reported that she "had [PT] and still persisting pain" and a "prednisone taper with no relief." *Id.* She also stated that her pain was "mostly numbness and tingling down the arm." *Id.*

- A physical examination of the left shoulder showed slightly diminished strength, tenderness to palpation at the deltoid, and normal ROM. Ex. 2 at 869. The orthopedist opined that Petitioner's "[l]eft shoulder pain [was] likely [an] axillary nerve injury from vaccine injection given January 2023." *Id.* The orthopedist explained to Petitioner that "nerve injuries can take up to a year to resolve. Sometimes may be permanent." *Id.* Petitioner was told to "follow up as needed." *Id.*

- Between May and June 2023, Petitioner had several communications with her PCP for unrelated issues. *See,* e.g., Ex. 2 at 883 (a May 22, 2023 report of foot pain); Ex. 2 at 886 (a May 27, 2023 phone call for a torn piercing);

5

- Ex. 2 at 893 (a June 2, 2023 report of migraine headaches with "really bad body aches and chills"); Ex. 2 at 897, 900-01 (a June 16, 2023 visit for foot pain and migraines). She did not report ongoing left shoulder pain during any of these encounters or communications.

- On July 24, 2023 (six months and one day post vaccination), Petitioner sent a message to her orthopedist stating that she "was hoping by now [her] upper shoulder would feel better. But [she does] still have continued pain and wanted to see what options there are." Ex. 2 at 925. The orthopedist ordered an MRI "to further evaluate [her] shoulder pain." *Id.*

- The day following this report, on July 25, 2023, Petitioner's counsel submitted a request for all of Petitioner's medical records to support the instant claim. Ex. 2 at 1-2.

- Over four months later, on November 30, 2023, Petitioner underwent an MRI of her left shoulder to assess a "left axillary nerve injury." Ex. 5 at 1. The MRI showed "mild degenerative osteoarthrosis of the acromioclavicular joint" and "mild tendinosis of the distal supraspinatus tendon," but no evidence of a nerve injury or rotator cuff tear. *Id.*

- Petitioner's orthopedist messaged her regarding the results of her MRI on December 1, 2023. Ex. 6 at 22. The orthopedist did not feel that the findings supported surgery and recommended PT. *Id.* Petitioner inquired regarding whether there was "any correlation with the injects [sic] [she] had[.]" *Id.* at 21. The orthopedist stated that the irritation and inflammation seen on MRI are "typically for [sic] overuse of the shoulder. Usually with ice, rest, NSAIDs . . . and avoid aggravating activities will calm it down." *Id.* The orthopedist felt there was "no correlation with the injections that [he] can see." *Id.*

- From December 2023 to June 2024, Petitioner sought care for a number of acute issues, without mentioning left shoulder pain at any visit during this time. *See,* e.g., Ex. 6 at 30, 39 (December 2023 and January 2024 eye appointments); Ex. 6 at 82-84, 97, 136 (June 10-11 and June 18, 2024 visits for an acute respiratory illness).

- On June 21, 2024, Petitioner went to the ER following a car accident. Ex. 6 at 189. Petitioner had left shoulder pain, a left forearm abrasion, facial pain, whiplash of the neck, and a hiatal hernia. *Id.* at 190.

6

- The next month (on July 10, 2024), Petitioner sent a message to a new PCP, reporting that she had been "injected incorrectly" in January of 2023 and has had "ongoing pain on [her] left arm." Ex. 6 at 143. She noted she had been referred by her orthopedist to PT "but the referral had expired." *Id.* She was "still interested in going through that to see if it could help with the pain." *Id.* Petitioner also noted "new concerns" as of June 20th when she was in a car accident, that included left shoulder pain. *Id.*

- Petitioner had a wellness visit with her PCP on July 12, 2024. Ex. 6 at 147. She described jaw pain, plus "pain in the upper head, neck, and hips" from a car accident three weeks prior. *Id.* at 147-48. Petitioner also reported "having a long-standing pain in the arm due to a misinjection [sic] last year." *Id.* at 148.

- Petitioner attended one PT session on July 24, 2024, for "neck, shoulder, and hip pain most [motor vehicle accident] on 06/20/2024." Ex. 6 at 182. Specifically, Petitioner noted "bilateral neck and shoulder pain," worse on the left side. *Id.* at 183. No additional medical records have been filed.

- In her declaration (drafted in January 2024), Petitioner stated that she had immediate pain upon receiving the subject vaccines. Ex. 4 ¶ 4. She explained that "[a]lthough the pain waxed and waned for the first few days, it ultimately continued to worsen" and her "discomfort only intensified" as time passed. *Id.* Petitioner wrote that "[s]ince that day, [she has] been burdened by constant pain in [her] left arm that has not shown any signs of improvement." *Id.* No other affidavit or declaration evidence has been submitted.

## ANALYSIS

The Vaccine Act requires that a petitioner demonstrate that "residual effects or complications" of a vaccine related injury continued for more than six months. Vaccine Act § 11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. § 13(a)(1)(A). To satisfy the six-month requirement, "[a] potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute." *Faup v. Sec'y of Health & Hum. Servs.,* No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). Rather, a petitioner is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months[.]" *Id.*

More so, "the fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Hum. Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Hum. Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (finding that a petitioner suffered from residual symptoms that due to their mild nature did not require medical care and thus that "a discharge from medical care does not necessarily indicate there are no residual effects"). In another SPU case, where a petitioner's last treatment was at five months and nine days, the petitioner was found to meet the six-month requirement. *Schafer v. Sec'y of Health & Hum. Servs.*, No. 16-0593V, 2019 WL 5849524 (Fed. Cl. Spec. Mstr. Aug. 28, 2019). In that case, based on the petitioner's symptomology and progression, the special master noted that it was unlikely "that petitioner's shoulder symptoms would have resolved within [the next] 22 days." *Id*. at *7.

There appears to be no dispute herein that Petitioner received the flu and Tdap vaccines on January 23, 2023. Although Respondent has contested that the onset of Petitioner's post-vaccination shoulder symptoms occurred within 48 hours of the subject vaccinations, I will assume *arguendo* that this requirement has been met, as a preliminary review of the evidence seems to favor Petitioner on this issue (and would likely be decided that way if it remains a disputed issue going forward).[6] She therefore must demonstrate by preponderant evidence that her residual symptoms continued for more than six months thereafter from onset, or through July 25, 2023. *See,* e.g., *Herren,* 2014 WL 3889070, at *3.

The records discussed above establish that on May 18, 2023 (68 days shy of the severity "cut-off"), Petitioner "had still persisting pain" after some treatment with PT and a prednisone taper had also failed to provide relief. Ex. 2 at 867. She exhibited diminished strength and tenderness to palpation at the deltoid on examination. *Id.* at 869. Petitioner's treater informed her that the suspected "axillary nerve injury" could take up to a year to resolve or could be permanent; thus, Petitioner was told to return to care "as needed." *Id.* These record notations, with a treater's view that Petitioner's injury could take up to a year to heal, plus an instruction to return as needed, provide evidence that Petitioner's injury was at this point likely ongoing, and that her treating physician did not predict that the injury was likely to resolve soon thereafter – or even within the next approximately two months. *See,* e.g., *Schafer*, 2019 WL 5849524, at *7.

---

[6] Petitioner sought care within nine days of the subject vaccinations and consistently reported thereafter that her pain began following them. *See,* e.g., Ex. 2 at 801 (a February 7, 2023 PCP note that she "received vaccines on 1/23/2023, x2 weeks – left arm at injection = small hard lump[.]"); Ex. 2 at 822 (a February 10, 2023 PCP note reporting "left arm pain after receiving vaccines on 1/223/23 [sic]."); Ex. 2 at 867 (a May 18, 2023 orthopedic note that her "shoulder pain began after having vaccine administered.").

8

I will note, however, that such notations *just barely* merit sufficient evidence to find in Petitioner's favor on severity. Indeed, I balance the absence of record evidence showing that Petitioner's injury had fully resolved by this May 18, 2023 orthopedic visit with the fact that she had several encounters after this time (through mid-June) *with her PCP* without mentioning ongoing shoulder symptoms. *See,* e.g., Ex. 2 at 883, 886, 897. Still, the fact that she sought treatment soon thereafter with her PCP for other, non-shoulder related and acute issues does not preclude Petitioner from establishing severity – as the visit notes from her last in-person orthopedic encounter indeed show lingering pain and tenderness of the deltoid. *See id.* at 867-69.

Additionally, I am not much relying on the July 24, 2023 message entry (Ex. 2 at 925) in resolving severity – as there exists reason to doubt the credibility of the report. For instance, while Petitioner complained to her orthopedist of "continued" pain that she hoped would have resolved by that time, the message was sent just *one day* prior to Petitioner's counsel submitting requests for records in support of the instant claim – and thus shows Petitioner was then in contact with counsel regarding her claim. Ex. 2 at 1-2.

Special masters have often afforded less weight to statements made to treating physicians when made in the context of litigation, or those made after a petitioner began to suspect she might have a Program claim. *See,* e.g., *Rastetter v. Sec'y of Health & Hum. Servs.,* No. 19-1840V, 2023 WL 5552317, at *10 (Fed. Cl. Spec. Mstr. Aug. 3, 2023) (affording little weight to a statement made after a 17-month gap in treatment, where the petitioner told the treater the return to care was at the direction of the lawyer); *Duda v. Sec'y of Health & Hum. Servs.,* No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) (affording less weight to later statements made for the purposes of litigation that directly conflicted with earlier reports to treaters). While this does not mean that *every* petitioner who knows of the Program's existence or has a potential vaccine claim is inherently not credible, the specific factual circumstances of each case must be considered. *See Buck v. Sec'y of Health & Hum. Servs.,* No. 19-1301V, 2023 WL 6213423, at *8 (Fed. Cl. Spec. Mstr. Aug. 23, 2023).

Here, the July 24, 2023 report of ongoing pain came more than two months after Petitioner's last documented report of shoulder pain in the medical records (on May 18, 2023). And, while Petitioner's orthopedist recommended an MRI (following the July 2023 report) to further assess Petitioner's injury, Petitioner waited *more than four months* (until November 30, 2023), before undergoing this diagnostic procedure. Even after undergoing this test, reviewing the results, and hearing the orthopedist's recommendation to receive further treatment with PT, Petitioner did not follow through on the referral or return for shoulder-related care thereafter (until *after* her involvement in a car accident affected the left shoulder). *See* Ex. 6 at 22, 143, 147. These factual circumstances, when taken

together, do not preponderantly support the proposition that Petitioner's July 24th report was made for the purpose of seeking ongoing care, as alleged, and I therefore afford this statement little weight.

In fact, all of the above speaks to the obvious mildness of Petitioner's symptoms[7] – but that is a matter that goes to the ultimate quantum of damages to be paid, rather than whether severity has been established. The fact that her injury was not acute or lengthy does not prevent the determination that it nevertheless lingered long enough to satisfy severity under the Vaccine Act.

### Conclusion and Scheduling Order

Petitioner has provided preponderant evidence showing that the sequelae of her injury persisted for more than six months post vaccination onset.

I will note, however, that Respondent's remaining objections to a Table SIRVA[8] (not discussed in this Ruling) *could* ultimately require more evaluation. I thus *strongly* encourage the parties to promptly re-attempt an informal resolution of this claim before expending any further litigative resources on the case. If at any time informal resolution appears unlikely, given that the claim has been pending in SPU for over one year (having been assigned in April 2024), the parties should propose a method for moving forward, i.e., with a proposed briefing schedule or otherwise stating how they wish to proceed.

Accordingly, **by no later than Wednesday, August 27, 2025**, the parties shall file a joint status report confirming the date on which Petitioner conveyed, or intends to convey, a *reasonable* settlement demand (i.e., one that accounts for the discussion herein) and supporting documentation for Respondent's consideration

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[7] Indeed, Petitioner's left shoulder symptoms were not especially severe, even at the time she did obtain treatment. For this reason, Petitioner should not expect to receive any damages for care sought after the November 2023 MRI *at the very latest* – as her decision to return to care following this time was due to her involvement in a car accident. *See,* e.g., Ex. 6 at 143, 147-48, 182-83. Petitioner should thus anticipate a *very* modest pain and suffering award as she barely satisfied the Act's severity requirement.

[8] *See supra,* note 3 (noting that in disputing Petitioner's Table SIRVA claim, Respondent also argued that Petitioner's symptoms were not limited to the vaccinated shoulder, and she failed to exhibit limited ROM on examination).